## JOEL *et al.* v. PUBLIX-LUCAS THEATRES INC. *et al.; et vice versa.*

Nos. 13930, 13933. MARCH 10, 1942.

*Walter G. Cornett,* for plaintiffs. *Erwin & Nix,* for defendants.

ATKINSON, Presiding Justice. The plaintiffs are owners of a lot in Athens, Georgia, lying at the southeast corner of Broad and Jackson Streets and extending south to South Street. This lot will hereinafter be referred to as the "Bishop lot," that being the name by which it was originally called. The defendant corpora-

tion is the owner of the lot hereinafter called the "Morris lot," which fronts on the south side of Broad Street and lies immediately east of the Bishop lot. The present controversy relates to rights claimed by said defendant in the east wall of the building on the Bishop lot, which wall stands entirely on the Bishop land. The corporation acquired title to the Morris lot on March 21, 1941. At that date there was on the Morris lot a three-story building which covered the entire lot, and this building was connected with the east wall of the building on the Bishop lot. Said defendant demolished this building and began the construction of a new building to be used as a theater. It planned to utilize its alleged rights in the wall in question, and connect its new building therewith. The plaintiffs denied the right of said defendant to do this, and filed this action for injunction, amending later by adding a count in ejectment. An interlocutory injunction was denied. The plaintiffs did not except. The case proceeded to final trial, and resulted in a directed verdict for the defendants. The plaintiffs' motion for a new trial was overruled, and they excepted. The petition was three times amended. To the second amendment adding the count in ejectment the defendant demurred. To an order overruling this demurrer this defendant excepted.

There has been filed in this court an affidavit stating that the theater building has now been completed, and that all acts which the plaintiffs sought to have enjoined have been done; but it is unnecessary now to consider either this affidavit or the original prayer for injunction. It does not appear that in completing the building the defendants have violated any court order. The controlling question in the case is whether the right claimed by the defendant corporation to utilize the wall of the Bishop building in connection with the new theater building does or does not exist. As the record now stands the case should be decided on the count in ejectment. If the plaintiffs were entitled to prevail on the issue just stated, a decree in their favor with writ of possession would afford them adequate relief, the defendant corporation being now in actual possession of portions of the wall, which, as previously stated, stands wholly on land the title to which is admittedly in the plaintiffs. See *Wachslein* v. *Christopher*, 128 *Ga.* 229 (57 S. E. 511, 11 L. R. A. (N. S.) 917, 119 Am. St. R. 381); *Lockwood* v. *Daniel*, 193 *Ga.* 122 (17 S. E. 2d, 542).

The important dates in the history of the wall in question and its user are 1888 and 1913. The court is of the opinion that the plaintiffs' case must fail, because of what happened in 1913 and the conditions which have since existed; but consideration may be given to the occurrences in 1888, as they form a background of what transpired in 1913.

The defendant theater corporation claims, as an initial proposition, that the right of the owner of the Morris lot to use the east wall of the building on the Bishop lot, even if it had not previously existed, came into existence through grant by Mrs. Bishop, the then owner, in 1888, of a parol license which thereafter ripened into an easement running with the land, in favor of the owner of the Morris lot. In support of this contention the defendants introduced the testimony of Mr. Thomas S. Mell, a practicing attorney of Athens: "I was admitted to the bar in 1880, and have been here ever since. I am familiar with the lot of land . . located on the southeast corner of Broad and Jackson Streets. I am familiar with the adjoining lot of land. . . I recall, while Mendel Morris owned what was later the Huggins property and the Bishops owned what is now the Joel property, a controversy arising about the wall between those two properties. That is the east wall of the present Joel building. Prior to 1889—that building has on its face this date 1889—prior to that time, a short while before, while the building was being erected . . by Mrs. Bishop, and the old building had been torn down all except the east wall . . and had started to erect the present building, and Mr. Mendel Morris objected to a third story being put on that east wall, claiming that he had a party-wall interest in it, and he objected to a third story being put on it. Mr. Morris's building went part way back of the lot, and there was a vacant lot in back, and the Bishop property was only a one-story building. Mr. Morris extended his building to South Street, and, that being so, attached his building to the one-story wall of the Bishop building. I told Mr. Morris if he insisted upon his objection he would have to put supports under the roof of the rear part story, or I was going to instruct the contractors to saw off all the building that went into it. There was no protest against Morris having the right to use the front part of the wall as a party wall whatever; there was no objection made on that ground; and we finally, Mr. Morris and

Mr. Bishop, agreed he was going to withdraw his objection to going higher than one story, and Mrs. Bishop would withdraw her objection, and that the whole wall from Broad Street to South Street should be a party wall. That occurred about 1888. . . In 1888 occurred that controversy that resulted in that being agreed on as a party wall between him and the Bishops, and that is the present wall of the Joel Building. . . The front part of the Bishop building on Broad Street was two stories high at that time, and the Morris building was two stories. The stories were not anything like as high as at the present time. . . As to how long I would say that was a party wall, I know positively it was a party wall back in 1888. I was practicing law at that time. I was attorney for Bishop at that time. Morris contended at that time that that was a party wall; each building was two stories high attached to that wall, and he contended as a party wall Bishop had no right to build that party wall higher than it was. I . . did not reduce the agreement to writing."

No objection to any part of Mr. Mell's testimony was entered. If his statements had consisted entirely of hearsay, they would have had no probative value even in the absence of objection; but the essential features were not hearsay. The assertion, "I know positively it was a party wall back in 1888," would have been subject to the objection that it was a conclusion, but the entire testimony was by no means without probative value.

The Code, § 85-1404, declares: "A parol license is primarily revocable at any time, if its revocation does no harm to the person to whom it has been granted; but it is not revocable when the licensee has executed it and in so doing has incurred expense. In such case it becomes an easement running with the land." Even without deciding how much weight is to be attached to the conclusion of Mr. Mell quoted above, or whether what happened in 1888 was sufficient to make the wall technically a party wall, if it had not been one before, his testimony was sufficient to establish the creation of a parol license granted by Bishop to Morris, which the record shows was executed by the erection of buildings; the one on the Morris lot being joined to the east wall of the one on the Bishop lot; and there can be no doubt that in making the connection with the wall Morris incurred expense, and that harm would have resulted to him had the license thereafter been revoked.

Mr. Mell's evidence was sufficient to show that the 1888 agreement embraced all essential elements. There was a definite subject-matter on which it was to operate, there had existed a controversy which by the agreement was settled (consideration), and the agreement was then executed by Morris. The undisputed evidence showed acquiescence thereafter by the owner of the Bishop lot until 1913, when the situation underwent another fundamental change which will be discussed later. Mr. Mell's phrase "the whole wall" may have been ambiguous, but it is unnecessary to decide whether he had reference to the two-story wall then in existence or the three-story wall which was in contemplation. That point is not now important; nor is it important, as plaintiffs insist, that the user of the wall in 1888 by the owner of the Morris lot did not extend to the entire three-story wall.

In 1888, before the agreement between Bishop and Morris, the building on the Bishop lot extended from the front line to the rear line, was of brick, and was two stories high for a part of its depth and one story at the South Street frontage. The permanent building on the Morris lot was a two-story brick, attached to the Bishop wall, but this building extended only part of the way back. There appears to be some doubt as to the character of the improvements which then existed on the Morris lot south of his permanent building. The plaintiffs contend that they consisted only of a shed or stable, and that even these did not cover all of the lot not occupied by the permanent building—that there was a part of the lot which was vacant. It is insisted that under no view of the agreement of 1888 could the owner of the Morris lot have acquired any right to use an entire three-story wall on the Bishop lot; that the right of user, following the agreement, could not be held to extend beyond that part of the wall to which the building or buildings then located on the Morris lot were actually attached; and that it was error for the court not to submit to the jury the question as to the extent of the exercise of the license which followed its grant. From what will be hereafter said it was unnecessary to submit this question to the jury.

Mrs. Bishop completed her three-story building, and the situation remained as it then was until 1913, when Morris sold his lot to Huggins, executing to him a bond for title dated March 11, 1913, which obligated him to convey to Huggins the property "to-

gether with all the rights to the adjoining partition walls on the east and west of said lots as they have been and are now owned, used, and employed by said Mendel Morris." This bond for title was not recorded. Huggins then wrecked the old improvements on the lot covered by his bond, and erected a three-story brick building covering the entire Morris lot. On November 1, 1913, he received the deed which had been called for by the bond for title; and plaintiffs call attention to the fact that in this deed there was no mention of specific rights in any wall. However, while the deed did not specifically mention party-wall rights, the matter had previously taken a different direction. In excavating for the new building Huggins discovered that the wall in question did not go deep enough into the ground to permit the safe completion of the excavation. Reinforcement was required. Conferences between the respective owners evidently followed, and these resulted in an agreement between Mrs. Joel, the then owner of the Bishop lot, and Huggins. This agreement was in writing, dated May 20, 1913, and was as follows: "Inasmuch as H. T. Huggins and Son have purchased the adjoining property and will improve same, Mrs. Etta Joel agrees to allow them the free use of the wall now standing between these two pieces of property. Inasmuch as Mrs. Etta Joel has agreed to allow them free use of this wall in their building, H. T. Huggins & Son agree to secure her from any loss or damage which may accrue or occur on account of their using said wall in their building." The agreement was signed by both parties, and Huggins then went ahead and put in the necessary reinforcements, completed his three-story building, covering the entire lot, and joined it to the east wall of the Bishop lot. The record shows the details of the connections Huggins made with the wall. They consisted of some twenty-eight "I-beams" fifteen inches high; the ends of these beams penetrated the wall for a distance of "at least eight or ten inches," and were "tied" therein. It may be stated here that the uncontradicted evidence was that the strain put on the wall by this Huggins building was about six or seven times as great as the strain which the present connections resulting from the erection of the new theater building puts on it.

The building erected by Huggins on the Morris lot stood, so far as the record shows, without change or controversy until 1941, when the defendant corporation bought the lot, demolished the

old building, and erected the present theater. This court regards these undisputed facts as controlling of the case: Before the end of 1913 there were on the two lots two three-story buildings, the west side of the one on the Morris lot being supported by steel girders running into the east wall of the one on the Bishop lot, this connection with the wall having been made under a claim of right and in pursuance of the agreement of May, 1913. These buildings remained as they were until the defendant corporation bought the Morris lot in 1941. The deed to the corporation expressly conveyed all easements, interest in walls, and all other rights appertaining to the property which had been used or enjoyed by the grantors. From 1913 to 1941, when the corporation wrecked the building on the Morris lot, there was no protest by any owner of the Bishop lot as to the user of the wall.

No point is made that the contract of May, 1913, contained no specific description either of the wall or the lots. In his brief counsel for the plaintiffs states that the identification of the buildings was admitted. It is true that the deed from Morris to Huggins did not contain the reference to partition walls which the bond for title had contained; but it is nevertheless true that Huggins continued to use and enjoy his rights in the wall as long as he owned the property. The evidence shows clearly that there has been a user, which nobody claims originated in fraud, for a length of time greater than any period required by statute to mature a prescriptive right.

While the case at bar is controlled by the principle stated in the Code, § 85-1404, supra, it is of some interest to note the general rules stated in 47 C. J. 1329 et seq. Among these are: "Where the agreement for the erection of a wall by one adjoining landowner and the use thereof by the other does not specify the nature or extent of any particular use, no such nature or extent need be shown to constitute the wall a party wall." "Where a wall between adjoining buildings has, during at least the prescriptive period, usually twenty years, been continuously and uninterruptedly used as a party wall by the respective owners, such wall becomes a 'party wall' within the legal meaning of the term, or, at least, a right or easement arises to use it as such, even though the wall stands wholly on the land of one of the adjoining owners." "It has been held that the easement of support afforded by a party

wall is not limited to the building originally erected, but extends to and includes any new structure that may be erected and supported by the wall, especially by virtue of a contract between the parties to that effect." The general rule, which is also referred to in Corpus Juris, that after long user without material objection or interruption a grant of the right will be presumed, has been recognized in Georgia. *Habersham* v. *Savannah & Ogechee Canal Co., 26 Ga.* 665. And the Georgia Code, § 85-409, expressly declares that an incorporeal right (easement) may be acquired by prescription.

The foregoing considerations control all features of the case at bar. All the authorities cited by the plaintiffs have been carefully considered. There is nothing in any of them which requires a conclusion other than has been reached. Counsel lays stress on the ruling in *Levinson* v. *Goode, 164 Ga.* 361 (138 S. E. 583) : "The extent of an easement to use a wall of an adjoining owner for the support of a building, which is acquired by prescription, is the enjoyment of the use of the wall for the support of the house as it existed during the period of prescription. . . The owner of a wall which is subject to an easement by prescription for the support of the building of an adjoining owner has the right, on raising the wall higher, to the sole use thereof, unaffected by any easement for the use of the new portion to support an additional story of the house to which the easement belongs." While it is true that in 1888, when the agreement to which Mr. Mell testified was made, the building on the Bishop lot was only two stories high in front and only one story in the back, the difference which then arose between the owners was brought about by the fact that Mrs. Bishop planned a new building for her lot and had already torn the old one down, all except the east wall. Morris objected to a third story being put on the wall, and it was this which brought about the controversy which was settled a little later by the agreement testified to by Mr. Mell, "that the whole wall from Broad Street to South Street should be a party wall." Any question as to whether the license or easement thereafter covered the entire new three-story wall which Mrs. Bishop then completed was rendered inconsequential by the 1913 transaction under which the old Morris building was razed and the new three-story Huggins building was erected and tied to the wall throughout its length and height. The wall which Mrs. Bishop completed in 1888 or 1889 is the actual

wall now in controversy; Mrs. Bishop's building still stands on the Bishop lot; and it is that wall—all of it—which has been continuously utilized by the Morris property since 1913.

Nothing ruled in *Meadows* v. *Page,* 187 *Ga.* 686 (1 S. E. 2d, 656), which is stressed by counsel, is contrary to the present ruling. The principle presented in that case was quite different from the one presented here.

Plaintiffs' counsel urges, as significant, that the bond for title accepted by Huggins on March 11, 1913, covering the Morris lot, contained a recital that the land was to be conveyed "together with all the rights to the adjoining partition walls on the east and west," which provision did not appear in the deed executed November 1, 1913. This point has been referred to above, and it need only be added that there is no significance in the omission. It appears that between the date of the bond and the date of the deed the new Huggins building was erected and fastened to the wall in virtue of the contract of May 20, 1913, which has been previously discussed. Whether the omission from the deed of the quoted recital which the bond for title had contained was through inadvertence, or resulted from a belief that it was no longer of importance, makes no difference. Before the deed was executed the new building had been tied into the wall, the right to the easement was being asserted by the one owner and acquiesced in by the other, and prescription had begun to run.

Counsel calls attention to the fact that the same attorney who had drawn the bond for title drew the deed from Mrs. Bishop to Mrs. Joel, dated September 26, 1905, in which deed there was no mention of the property being subject to an easement; but it is obvious that that can not now affect the present owner of the Morris lot. No right in the wall possessed by any owner of the Morris lot could be affected by any terms in or omissions from the language used in conveyances passing between successive owners of the Bishop lot. And it was long after she accepted Mrs. Bishop's deed that Mrs. Joel made the agreement with Huggins in 1913.

It is also contended that the agreement of May 20, 1913, between Mrs. Joel and Huggins was nothing but a license, personal in character, was not assignable, and no right thereunder passed to the subsequent owner. Authorities are cited to the effect that a license is ordinarily affected by the items just stated and in and

of itself passes no interest in the realty, but the Code, § 85-1404, expressly declares that when the licensee has executed the license, and in doing so has incurred expense, it becomes an easement running with the land. It follows that even if the May, 1913, agreement created a license only, that license was a license no longer when the Huggins building was completed and connected with the wall in the latter part of 1913. When that connection was made, the license was transformed into an easement which thereafter ran with the land. These considerations finally dispose of the many contentions of counsel to the effect that the writing of May, 1913, was personal only to Huggins, was non-assignable, related to the Huggins building alone, was never intended to apply to any building erected thereafter, and that all rights thereunder vanished when the Huggins building was razed in 1941.

Plaintiffs' contention that the user, throughout the entire period, has been by permission only, and that permissive user can never ripen into an easement, is not supported by the record. The user has been under a definite claim of right. Nor is there support for the position that the easement, if one existed, has been lost by abandonment or non-user. The wrecking of the Morris building by Huggins in 1913 was not accompanied by anything remotely indicating an intention to abandon the right of user of the wall. The breaking of the physical connections between the wall and the old Morris building was but a part of the plan for the erection of the new building, and no loss of any existing right thereby resulted. The new structure was immediately built and tied into the wall, and, after execution of the 1913 agreement, continued to stand without protest from the owner of the Bishop lot. The same consideration applies to the wrecking of the Huggins building in 1941 and the erection of the theater building. See Code § 85-1403; *Gaston* v. *Gainesville &c. Ry. Co., 120 Ga.* 516 (2) (48 S. E. 188).

In plaintiffs' brief is the following statement: "Not until the cause of action arose were the plaintiffs or their predecessors in title placed on notice that the defendants or their predecessors claimed the wall to be a party wall." Also: "The plaintiffs contended . . that neither the plaintiffs nor their predecessors in title had any notice of a potential claim of easement in perpetuity in the wall as a party wall." In the brief there is one other reference to this alleged absence of notice.

Mrs. Joel made the agreement with Huggins in 1913, and before the close of that year the Huggins building was completed. In December, 1934, according to the abstract of the title attached to one of plaintiffs' amendments, Mrs. Joel conveyed her property to the plaintiffs. At that time the two buildings for more than twenty years had been utilizing the one wall in virtue of the Joel-Huggins agreement. When the plaintiffs took their deed from Mrs. Joel, if they were without any knowledge of the fact that the 1913 agreement had been executed, and if the adverse user of the wall was not so apparent to any ordinarily prudent purchaser as to put him on notice of the claim of the occupant of the wall (see Code §§ 37-116, 85-408), the plaintiffs should have proved those things at the trial. This they did not do.

The jury, under direction of the court, found a general verdict for the defendants. The motion for new trial alleges in one ground that "the evidence was conflicting upon material facts and was subject to more than one construction," and that for this reason the case should have been submitted to the jury, and it was error to direct a verdict. But there was no conflict in the evidence as to the question of notice to the plaintiffs, or absence thereof, of the existence of the easement. No evidence whatever was introduced on that point. Neither of the plaintiffs stated that the deed from Mrs. Joel to them in 1934 had been taken without notice of any easement, or that ordinary observation would not have revealed the fact that both buildings were being supported by the one wall. The plaintiffs were under the burden to establish every fact which was essential to their right to recover. Absence of notice was one of those facts. The plaintiffs failed to carry their burden. Code, § 38-103. It seems unnecessary to discuss this point further; but as matter of interest reference may be made to two cases which, taken together, show the rule applicable where the point under discussion is involved. The first is *Rome Gas-Light Co.* v. *Meyerhardt*, 61 *Ga.* 287, where it was held: "Whether a purchaser of land through which a gas company had run its pipes, by consent of a former owner, took subject to the easement or not, depends upon whether he had notice thereof at the time of the purchase, or had notice of facts sufficient to put a reasonable man on inquiry." The easement there involved related to a gas pipe which the property owner discovered while excavating for his basement.

The court properly submitted the question of notice to the jury, and they found in favor of the owner and against the gas company. But clearly, when the easement being enjoyed is open and observable to any reasonably prudent person, the question of notice is not one of fact but one of law. The other case is *Calhoun* v. *Ozburn*, 186 *Ga.* 569, 572 (198 S. E. 706) : "While it is the general rule that a bona fide purchaser of land without actual or constructive notice of the existence of an easement takes the title free of such a burden, and one buying land may ordinarily assume that there is no easement except such as may be shown of record or by open and visible indication on the land itself, yet a purchaser will be charged with notice of an easement where an inspection of the premises would have readily revealed such physical facts as would have put him upon inquiry in the exercise of ordinary diligence. 41 A. L. R. 1442, 1448, 1449, note and cit.; 9 R. C. L. 805, 806, § 61; 4 R. C. L. Supp. 2555, § 61; 19 C. J. 939, 940, §§ 145-147, and cit."

It would seem to be altogether unreasonable to suppose that any ordinarily prudent prospective purchaser of the Joel building in 1934 could have failed to note that the Huggins building was supported by the wall in question; but this decision is not based on that proposition. The failure of the plaintiffs to carry the burden of proof as to this item is the controlling point in this connection.

In the record is a photograph taken in 1900, showing a view of the two buildings as they then stood; also there is a graphic plat made by a surveyor after the Huggins building was torn down and the old brickwork of the Bishop building was exposed. Stress is laid on the picture and the plat as showing that the early user of the wall was for only a limited portion of its entire length. This court does not regard this evidence as being of importance, in view of the agreement of 1913 and the way in which the wall was shown to have been used thereafter.

The court properly directed the verdict for the defendants. It is unnecessary to pass on the assignment of error in the cross-bill of exceptions.

*Judgment affirmed on the main bill of exceptions. Cross-bill dismissed. All the Justices concur.*

DUCKWORTH, J., concurs in the result.