**In re FLYBOY AVIATION
PROPERTIES, LLC,**
Debtor.

**Flyboy Aviation Properties,
LLC, Movant,**

v.

**Richard Franck, Respondent.**

**Bankruptcy No. 13–55775–BEM.
Adversary No. 13–05111–BEM.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Oct. 11, 2013.

Leon S. Jones, Leslie M. Pineyro, Jones and Walden, LLC, Edward W. McCrimmon, McCrimmon & McCrimmon Doraville, GA, for Debtor.

William F. Mitchell, Atlanta, GA, for Movant.

### *ORDER*

BARBARA ELLIS–MONRO, Bankruptcy Judge.

A trial was held in this adversary proceeding on September 23, 2013 (the "Trial"). Present at trial were Plaintiff's managing member, Joe Voyles, and Lisa McCrimmon, Ed McCrimmon, and Leon Jones, as Plaintiff's counsel. Also present were Defendant, Richard Franck, and his counsel, William Mitchell. Plaintiff Flyboy Aviation Properties, LLC ("Flyboy" or "Debtor") alleges in its Complaint that Defendant, Richard Franck ("Franck"), trespassed on Debtor's property, causing interference with business operations and lost revenue. Franck responded and counterclaimed, arguing that he has an easement to use the airport, and seeking such a declaration from the Court.

In an order entered September 10, 2013, the Court bifurcated the issues raised in the complaint, such that the only matter heard at Trial is "what interest, if any, Defendant has in Debtor's property, and the nature of that interest. The issues of trespass, damages, and fees will be tried at a later date." [Doc. No. 35].

After carefully considering the pleadings, the evidence presented and the appli-

cable authorities, the Court enters the following findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## I. JURISDICTION

Bankruptcy courts are courts of limited jurisdiction whose jurisdiction is "derivative of and dependent upon" the three categories of proceedings set forth in 28 U.S.C. § 1334. *See In re Toledo,* 170 F.3d 1340, 1344 (11th Cir.1999). The matter presently before the Court concerns the Debtor's largest, and possibly only asset, an interest asserted against that property as well as damage claims. The property at issue herein is property of the Debtor's bankruptcy estate and subject to the Court's exclusive jurisdiction under 28 U.S.C. § 1334(e). *See In re Finney,* 2008 WL 7874260 at *4–5, 2008 Bankr.LEXIS 3767 at *13 (Bankr.N.D.Ga.2008). Debtor states in its "Response to Defendant's Motion to Remand" [Doc. No. 13] that the claims in this proceeding constitute core matters pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O), and expressly consents to entry of a final order by this Court. In his "Brief in Support of Defendant's Motion to Remand Case to Superior Court of Forsyth County" [Doc. No. 9], Defendant agrees that this proceeding is a core matter. Thus, the Court will enter a final order in this proceeding. To the extent the matters herein are non-core, given the agreement of the parties, the Court will enter a final order in this proceeding. *See Seascape at Wrightsville Beach, LLC v. Mercer's Enters., Inc. (In re Mercer's Enters., Inc.),* 387 B.R. 681, 685–686 (Bankr.E.D.N.C.2008).

## II. FINDINGS OF FACT

### A. Procedural Posture

This case was commenced in the Superior Court of Forsyth County as *Flyboy v. Franck,* No. 08–CV–0509, on March 5, 2008 (the "State Court Action"). [Doc. No. 1, Ex. 1]. Debtor is the owner of certain real property at 3747 Mathis Airport Drive, Suwanee, Georgia, out of which the Debtor runs a small private airport (the "Airport"). [Doc. No. 1, Ex. 2]. Defendant Franck owns property in the neighborhood adjacent to the Airport, known as Mathis Airpark Subdivision (the "Subdivision"). The State Court Action arises out of Franck's alleged trespass on Airport property, for which Flyboy sought an injunction. Franck counterclaimed, asserting an easement for use of the Airport property, seeking damages for restricting his use of the Airport, and recording a notice of lis pendens against the Airport. [Doc. No. 1, Ex. 6]. Flyboy filed its Chapter 11 bankruptcy petition on March 15, 2013 and removed the State Court Action to this Court as an Adversary Proceeding on March 20, 2013, pursuant to 28 U.S.C. § 1452(a).

Defendant's "Motion to Remand" [Doc. No. 8] the Complaint back to the Superior Court of Forsyth County was denied [Doc. No. 18], and a hearing was held in the main case on Debtor's Motion For Authorization To Sell Real Properties Free And Clear Of Liens, Claims, Encumbrances, and Interests (the "§ 363 Hearing" and the "Sale Motion," respectively). [Main Case Doc. No. 46, 47]. By the Sale Motion, Debtor seeks to sell approximately sixteen acres of land comprised of the fourteen acre Airport and two acres of adjacent property located in the Subdivision (collectively, the "Airport Property"). After the conclusion of the presentation of evidence, the Court announced it would not rule on the Sale Motion without first determining what rights, if any, Franck has to use the Airport and/or the Airport Property. The evidence presented at the

§ 363 Hearing was included, with consent of the parties, in the record on the Trial.

### B. Facts

In the early 1980's L.G. Mathis and Patrick McLaughlin began selling off lots in the Subdivision. [Franck Exhibits 10–14, Franck Exhibits are hereinafter referred to as "Ex. F ——"]. A plat for the Subdivision was created in 1983 but was not recorded until 1995 or 1996. [Flyboy Exhibit 5, Flyboy Exhibits are hereinafter referred to as "Ex. FB ——"]. Louis A. Musgrove, Jr. ("Musgrove"), was the predecessor in interest to Defendant, having purchased approximately 4.1 acres of land in the Subdivision in 1984 from L.G. Mathis and Patrick McLaughlin. [Ex. F 15; Ex. FB 1]. Musgrove testified that before he purchased his property, he saw a plat map of the Subdivision which included the Airport. Musgrove testified that this plat was part of his incentive for purchasing property in the Subdivision. However, no plat was referred to in Musgrove's deed and none was recorded at the time Musgrove purchased his property.

In or around February, 1990, Musgrove completed construction of a hangar home, a building comprised of a top floor apartment and a hangar below. Musgrove accessed the Airport using Mathis Airpark Road, the road in front of his property, and the taxiway between the road and the Airport from at least 1989 through and including 2002 when he moved from the Subdivision. Musgrove used the taxiways, airport taxiways and runway on a regular basis during the time he owned property in the Subdivision without asking permission from the owner, C.J. Mathis. He also accessed the office at the Airport regularly to pay for gasoline purchases and for "hanging out for hangar flying" with other aviators. Musgrove had spent time at the office for these purposes since 1978. In addition, Musgrove jogged and walked on the Airport property while he lived in the Subdivision without seeking permission from C.J. Mathis. The Airport was a public Airport from the early 1960's until 2001 when C.J. Mathis filed an application to convert the airport to a private airport. Musgrove testified that as a public airport, "pretty much anyone who wanted could come and go" from the Airport. In 2002, Musgrove rented the hangar home to Mr. Berndsen ("Berndsen"), who used the hangar to store an airplane and a disassembled project plane. Musgrove testified that he believed Berndsen used Mathis Airport Road and the taxiway between the road and the Airport from 2002 until Musgrove sold his property to Defendant in March, 2004.

When Musgrove purchased his property in 1984, he received a document at closing titled "Addendum To Settlement Statement" (the "Addendum"), which states:

> As part of the consideration of this purchase and sale, Sellers agree that Purchasers shall be allowed to join taxiways to airport taxiways of Mathis Airport and to have use of landing strip as long as Mathis Airport shall continue as an airport; however this shall not restrict Sellers' right to sell said airport property as an airport or for other uses.
>
> Purchasers agree that they will not operate an aircraft repair service on the subject property so long as an aircraft repair service is maintained at Mathis Airport.
>
> This agreement shall survive the closing of this transaction.

[Ex. FB 2; Ex. F 17]. Musgrove believes he had an easement to use the taxiways (the private subdivision roads) and the Airport taxiways and runways based upon the easement granted in the Addendum, but did not consider his activities at the Airport office or walking/jogging on Airport

property to be part of his easement. Musgrove stated that he was exercising his rights in accordance with the Addendum when he taxied, landed and took off from the Airport.

Mr. and Mrs. McCrimmon moved into the Subdivision in 1992. The McCrimmons purchased their property from a Mr. McGrath who had purchased property in the Subdivision in or about 1980. Mrs. McCrimmon testified that in 1992 there were planes using Mathis Airpark Road to taxi to the Airport. The McCrimmons received an easement from C.J. Mathis in 1992 when they purchased their property in the Subdivision. They subsequently received an easement from Debtor as well, and both easements were recorded. [Ex. F 5]. Walter and Alice Propheter, residents of the Subdivision since 1983, testified that residents, including Musgrove and Franck, regularly taxied on Mathis Air Park Road and onto the taxiways and runway at the Airport and that Mrs. Propheter regularly walked on the taxiways.

In 1997, certain homeowners, including Musgrove, performed maintenance on Mathis Airpark Road by having a portion of the road/taxiway paved. The residents also cleared brush adjacent to the taxiway. Mr. Propheter and Mr. McCrimmon testified that the residents paid for paving work to be done in 1997 and Mr. McCrimmon stated that all but two residents contributed funds for the road paving project. Mrs. Propheter testified that she saw neighbors doing cleanup work close to the Airport and a tractor parked between Mathis Airport Road and the Airport taxiway. Mrs. McCrimmon testified that the neighbors maintained Mathis Air Park Road and the sixty (60) foot right of way easement but not any of the runway. Mr. McCrimmon and Musgrove testified that neighbors did not do any work on Airport property. In contrast, Mr. Propheter testified that in 1999 brush was removed from the Airport property on or near the runway. Mr. Propheter did not participate in the clean up but testified that he saw the work being done.

In addition to the Addendum, sometime between 1989 and 1991, Musgrove signed a document entitled "Declaration of Covenants, Conditions Restrictions and Easements For Mathis Airport Subdivision" (the "Declarations"). [Ex. F 32]. Other signatories to the Declarations included the developers of the Subdivision, L.G. Mathis and Patrick McLaughlin, and C.J. Mathis. It appears that not all of the residents of the Subdivision executed the Declarations because the McCrimmons' predecessor in title, McGrath, did not sign the Declarations.

Musgrove understood that the Declarations were "never filed and made enforceable." The Declarations reference two Exhibits that are not attached to the document and were never prepared. There were later versions of the Declarations that were generally acceptable to the residences of the Subdivision, but McLaughlin refused to sign a subsequent version of the Declarations. After the revised Declarations were drafted and were not signed by McLaughlin, McLaughlin fenced off part of a Subdivision road which prevented a resident from taxing his airplane to the Airport. This led to litigation that lasted twelve years to determine the residents' ability to use the roads within the Subdivision including Mathis Airpark Road. [Ex. FB 18].

In November, 2007, McLaughlin and L.G. Mathis deeded the private roads in the Subdivision to Mathis Airpark Residence's Association, Inc. ("MARA"). [Ex. FB 5; Ex. F 19]. The litigation over Mathis Air Park Road ended with the entry of a consent order on November 28, 2007, that provided in part,

Each owner of property and their successor in title bordering i.e. sharing a common boundary line with Air Park Road, also known as Mathis Air Park Road. . . . shall own fee simple title to the center of said Air Park Road which is adjacent and contiguous to said owner's property. . . . Each owner of such property and their successor in title shall have easement for ingress and egress to such owners' property, as necessary, over other such owners' property and interest in said road. . . .

[Ex. F 29]. Franck started MARA in 2007, approximately 21 days prior to MARA receiving the quit claim deed for the roads. Mrs. Propheter testified that currently the home owner's association does maintenance on the road and mail boxes and that "everyone has the opportunity to join the association."

Franck purchased the Musgrove property on March 30, 2004. [Ex. FB 1; Ex. F 16]. At that time, C.J. Mathis owned the Airport. [Ex. F 11, 12]. Franck did not buy his property based on a recorded plat. He saw a plat prior to purchasing his property but could not identify the 1983 plat. For approximately a year and a half after the purchase, Franck continued to rent the hangar home to Berndsen. Berndsen had a plane and continued to access the Airport after Franck's purchase of the Musgrove property. In 2005, Berndsen paid to use the Airport while he lived in the hangar home. [Ex. FB 89]. From 2004 to 2008, Franck had access to the Airport for the use of his plane, walking and biking; Franck never asked to use the Airport Property and was never questioned about his activities. However, since March, 2008 he has been blocked from using the Airport by Debtor.

After buying the Musgrove property, Franck purchased an additional piece of land that was annexed to the Musgrove property. [Ex. FB 3]. The combined parcel was subdivided and in May, 2005, Franck sold two of the four parcels to his brother, including tract # 4, which fronts Mathis Air Park Road. [Ex. F. 12, 13; FB 7, 9]. It is not clear what amount Franck was paid for these transfers. Franck built a house on his property around 2005–2006, and resided there until April of 2012. He then rented the house from April, 2012 through May, 2013. Franck currently lives in North Carolina. After selling the front tract of the combined property to his brother, Franck and his brother constructed a 60'x70' hangar on tract # 4. [Ex. FB 13].

Flyboy purchased the Airport Property on June 11, 2004. [Ex. F 23]. Franck asserts an easement to use the taxiways located on the Airport Property, the Airport runways and Mathis Airpark Road. Franck asserts that his easement arises either from prescription, necessity, implication, or express grant. Each of these theories is addressed below.

## III. CONCLUSIONS OF LAW

 Georgia law governs the determination of Franck's interest in taxiways and runways on Debtor's property. O.C.G.A. § 44–9–1 outlines the methods by which one can gain the right to access another's property:

The right of private way over another's land may arise from an express grant, from prescription by seven years' uninterrupted use . . . by implication of law when the right is necessary to the enjoyment of lands granted by the same owner.

. . .

O.C.G.A. § 44–9–1. In his various pleadings, Franck asserts numerous theories pursuant to which he gained the right to use Airport Property: easement by prescription, easement by necessity, an ex-

press grant, adverse possession, or by implication of a contract creating covenants, conditions, and restrictions on subdivision properties.[1] For the reasons set forth below, the evidence presented establishes that Franck has an express easement as set forth in the Addendum.

## A. Prescriptive Easement

■ Georgia law states with regard to prescriptive easements, "[w]henever a private way has been in constant and uninterrupted use for seven or more years and no legal steps have been taken to abolish it, it shall not be lawful for anyone to interfere with that private way." O.C.G.A. § 44-9-54. Georgia courts have developed and continually applied "four well known requirements" to determine if a party has obtained a prescriptive easement: "(1) that uninterrupted use of the crossing had continued for seven years or more; (2) that the width of the crossing did not exceed twenty feet; (3) that the width did not deviate from the number of feet originally appropriated; and (4) that [the prescriber] kept the crossing open and in repair for seven uninterrupted years." *Jackson v. Norfolk S. R.R.*, 255 Ga.App. 695, 695, 566 S.E.2d 415 (2002); *McGregor v. River Pond Farm, LLC*, 312 Ga.App. 652, 654, 719 S.E.2d 546 (2011). The acquisition and granting of prescriptive rights is viewed as a "harsh result for the burdened landowner," so much so that the elements of the statute and common law requirements are strictly construed and claimant must establish all elements to prevail. *Moody v. Degges*, 258 Ga.App. 135, 137, 573 S.E.2d 93 (2002).

### (i) Use for Seven Years

■ In order to establish a prescriptive easement, Franck must prove that adverse use has occurred for seven years or more. While Franck has not owned property in the Subdivision for long enough to satisfy that requirement, the time period required to establish a prescriptive easement can be tacked. "The only requirements are that the successive users have privity of title and that the use by the predecessor in title must have been adverse and must have met all the requirements for establishing a prescriptive easement." *Trammell v. Whetstone*, 250 Ga.App. 503, 508, 552 S.E.2d 485 (2001). It is undisputed that Musgrove sold his property to Franck, establishing privity of title.

■ O.C.G.A. § 44-5-161 states that "[p]ermissive possession cannot be the foundation of a prescription until an adverse claim and actual notice to the other party." Indeed, "[w]hen the use of a private way originates by permission of the owner, prescription does not begin to run until the user notifies the owner, by repairs or otherwise, that he has changed his position from that of a mere licensee to that of a prescriber." *McGregor*, 312 Ga. App. at 655-56, 719 S.E.2d 546; *see also Norfolk S. Ry. Co. v. Dempsey*, 267 Ga. 241, 242, 476 S.E.2d 577 (1996). Further-

---

1. Defendant argues in his reply brief that he alternatively may have acquired an easement by adverse possession. O.C.G.A. § 44-5-161 states, "(a) In order for possession to be the foundation of prescriptive title, it: (1) Must be in the right of the possessor and not of another; (2) Must not have originated in fraud [ ]; (3) Must be public, continuous, exclusive, uninterrupted, and peaceable; and (4) Must be accompanied by a claim of right. (b) Permissive possession cannot be the foundation of a prescription until an adverse claim and actual notice to the other party." Further, O.C.G.A. § 44-5-163 states that a period of 20 years of adverse possession will confer good title. Franck did not argue this theory at trial, but an assertion of adverse possession fails for various reasons: there was no testimony that Franck gave notice of his claim of adverse possession, and testimony was that numerous planes used the airport, negating a finding of exclusivity.

more, Georgia Courts have found that, "[t]he fact that the prescriber never asked for permission and the property owner never objected to the activities is inadequate to establish a prescriptive easement." *McGregor*, 312 Ga.App. at 656, 719 S.E.2d 546 (citing *Douglas v. Knox*, 232 Ga.App. 551, 552–53, 502 S.E.2d 490 (1998) (owner's knowledge of and acquiescence in use of private way is insufficient to establish prescription)); *see also Eileen B. White & Assoc. v. Gunnells*, 263 Ga. 360, 362, 434 S.E.2d 477 (1993) ("owner's acquiescence in the mere use of his road establishes, at most, a revocable license"). Georgia requires notice of "an *adverse* use, under claim of right, as distinguished from a mere permissive use." *Lopez v. Walker*, 250 Ga.App. 706, 708, 551 S.E.2d 745 (2001) (citation omitted; emphasis in original). An adverse use is one that is distinct from permissive, in the common sense of the word, and is inconsistent with the notion of the true owner's title. *Hasty v. Wilson*, 223 Ga. 739, 743, 158 S.E.2d 915 (1967).

█ Testimony at both the § 363 Hearing and the Trial was that there were no barriers between the Airport and those who wished to use it. Franck himself stated that he had no issues using the Airport before Flyboy installed a gate in 2008. The mere fact that C.J. Mathis, the owner of the Airport, did not expressly give Franck permission does not mean that Franck's use was adverse. C.J. Mathis acquiesced to the use, and at the same time, neither Musgrove nor Franck gave Mathis notice that he intended his status to be anything other than as a licensee, or exercising rights pursuant to Musgrove's express easement. Musgrove testified that he had an easement, and thus understood he had permission to use the Airport. Consequently, any use by Musgrove was permissive pursuant to the Ad-

dendum. Further, Berndsen's use was permissive as shown by the payments to Debtor. It was not until Flyboy revoked its permission that problems ensued, and since then, Franck has not been able to use the Airport.

#### (ii) Open and in Repair; Notice

█ Because the time period for the adverse claim of right to the taxiways and runway can only begin once the owner of the property has notice, the claimant must demonstrate that the owner of the Airport had notice of Musgrove's attempt to gain a prescriptive easement. A claimant attempting to gain a prescriptive easement must show that they openly repaired the property, or otherwise gave notice of an adverse claim. *Thompson v. McDougal*, 248 Ga.App. 270, 271, 546 S.E.2d 44 (2001) (citing *Eileen B. White & Assoc.*, 263 Ga. at 360–61, 434 S.E.2d 477). "The gist of the requirement as to repairs is not so much the repairs as the *notice* which is given by the repairs." *Norfolk S. Ry. Co.*, 267 Ga. at 242, 476 S.E.2d 577 (citing *First Christian Church v. Realty Inv. Co.*, 180 Ga. 35, 178 S.E. 303 (1934)). However, "when performed with permission of the landowner, even repairs to a road are insufficient, standing alone, to provide notice of adverse use.... This is so because the repairs must provide notice of adverse use; and repairs by permission are not adverse and therefore not prescriptive." *McGregor* at 655–56, 719 S.E.2d 546. Further, the repairs must be sufficient to establish that the claimant is exercising his claim contrary to the rights of the owner. *See Moody* at 139, 573 S.E.2d 93 (stating that mowing grass did not constitute sufficient notice of adversity as required for gaining prescriptive title); *see also First Christian Church*, 180 Ga. at 36, 178 S.E. 303 (finding that regularly sweeping a driveway, and on one occasion, removing a tree limb were not of such consequence that they

could be construed as "substantial notice or repair").

 Franck's testimony at the § 363 Hearing was that he had once volunteered to help with a "fair" of sorts to attract new Airport club members and business, and that he "pointed out" Airport code violations to County officials. [Ex. FB 22, 36]. Additionally, the evidence established that over 30 years the residents only performed repairs to Mathis Airpark Road and trimmed some brush that was not on the Airport property on two or three occasions. The only testimony that neighbors performed maintenance on the Airport Property came from Mr. Propheter, and was contradicted by the testimony of Mrs. Propheter, Mrs. and Mr. McCrimmon and Musgrove. Even if Mr. Propheter was correct that neighbors, on one occasion, cleared brush from the runway, this activity is not sufficient to provide notice.[2] Thus, there was not sufficient evidence to establish that any repairs or maintenance were substantial enough to serve as notice to the Airport owner of an adverse claim.

### (iii) Width of Easement

The third requirement to establish prescription is that the easement may not be wider than twenty (20) feet. The only evidence regarding the width of the Airport taxiways and Mathis Airpark Road came from certain plat maps that indicate that Mathis Airpark Road is sixty (60) feet wide, and testimony that the wingspan of an airplane used by Musgrove ranged from thirty-six to thirty-eight feet. [Ex. FB 5; F 21, 24]. There was no evidence presented on the width of the taxiway on the Airport property or the width of the Airport runway. Thus, the third element has not been proven.

### (iv) No Deviation of Easement

The final requirement to gain a prescriptive way is to prove that the width of the easement has not deviated during the time of appropriation. There was no evidence presented that addressed this necessary element. Franck's claim to a prescriptive easement fails because there is no evidence of notice of adversity, no evidence of seven years use after such notice of adversity and no evidence of the width of the taxiways and runways.

### B. Easement by Necessity[3]

 Defendant next argues that he has an easement by necessity, because the Airport property and the Subdivision property were once an entire parcel, which was divided into separate parcels and sold over time. [Ex. F 10–14]. Georgia law states that a right of private way by necessity can be acquired "by implication of law when the right is necessary to the enjoyment of lands granted by the same owner." O.C.G.A. § 44-9-1. Georgia law recognizes an easement by necessity,

> when the common owner sells the dominant estate first and retains the servient estate. The common owner is impliedly

---

2. Nor would it be sufficient to convert a license to an easement since there was no evidence of funds spent on Airport property. *See Lowe's Home Ctrs., Inc. v. Garrison Ridge Shopping Ctr. Marietta, GA., L.P.,* 283 Ga.App. 854, 643 S.E.2d 288 (2007) (finding that a licensee must expend funds on the servient estate to convert license to easement), *see also Decker Car Wash, Inc. v. BP Prods. N. Am., Inc.,* 286 Ga.App. 263, 267, 649 S.E.2d 317 (2007).

3. In his Motion for Summary Judgment, Franck alternatively argues that he has an easement by implication. [Doc. No. 1, Ex. 54]. In Georgia, an implied easement is classified as an easement by necessity, and arises "[w]here a landowner sells part of his land which is accessible only across the remaining land." 1 PINDAR'S GA. REAL ESTATE LAW & PROCEDURE § 8:20 (7th ed.).

deemed to have granted an easement to pass over the servient estate. However, if the common owner sells the servient estate first ..., he has deeded everything within his power to deed and retains no easement in the servient estate. Therefore, when the common grantor subsequently deeds the dominant estate to a third party, the third party can obtain no higher interest than that of the grantor and receives no easement over the servient estate.

*Burnette v. Caplan*, 287 Ga.App. 142, 650 S.E.2d 798 (2007); OCGA § 44–9–1. *See also Boyer v. Whiddon*, 264 Ga.App. 137, 589 S.E.2d 709 (2003). Thus, Georgia law recognizes easements by necessity when a party "had no ingress to or egress from its own land except by way of the [easement]." *Farris Const. Co., Inc. v. 3032 Briarcliff Rd. Assoc. Ltd.*, 247 Ga. 578, 277 S.E.2d 673 (1981). It is necessary to show that it is not a matter of convenience, but necessity, such that the owner of the dominant parcel has no way to reach his property but by traversing the servient parcel. *Id.; see also Calhoun v. Ozburn*, 186 Ga. 569, 571, 198 S.E. 706 (1938) ("[w]here a grantor conveyed land without providing means of egress and ingress, and the situation of the land was such as made it otherwise inaccessible, there was an implication that he had unintentionally omitted to convey a means of access. This necessary implication entitled the landlocked grantee to a way out to whatever public or private road furnished access to the premises"). Georgia courts have interpreted O.C.G.A. § 44–9–40 to provide for condemnation proceedings to establish private ways for landlocked parcels, to exclude the granting of a private way to property owners who have any other reasonable means of access to their property. *See generally Blount v. Chambers*, 257 Ga.App. 663, 572 S.E.2d 32 (2002) (finding that property owners were not entitled to condemnation of a private

right of way when they had two alternative routes to access the land, even though their access to these routes were not legally enforceable and could terminate at some time in the future.).

Franck relies on the case of *Hynes v. City of Lakeland*, 451 So.2d 505 (Fla.Dist. Ct.App.1984), for the proposition that easements by necessity should apply to the necessary ingress and egress for airplanes. [Doc. No. 38]. The Appellant in *Hynes* leased the ground upon which an airplane hangar owned by Appellant was situated. The hangar was located on public airport property. The lease provided for the use of "ramps, runways, taxiways, and other facilities provided for aircraft and the public." *Hynes*, 451 So.2d at 508. The Appellant's property was "landlocked," because use of roads and taxiways on airport property was the only way Appellant could access the leased property.

Although the Court believes that a Georgia court may agree with providing a way of necessity for airplanes given the holding in *Pierce v. Wise*, 282 Ga.App. 709, 639 S.E.2d 348 (2006), where the Court of Appeals acknowledged that transportation has changed over time and that this could require ingress and egress by means other than water, *Hynes* is clearly distinguishable from the situation here. In reversing the trial court's grant of summary judgment, the *Hynes* court focused on the origins of easements by necessity and the policy of preventing the idleness of real property. The Court noted that most leases contemplate a specific use and that use of the property at issue was "intended to be used for aircraft storage, maintenance, flying instruction, and flying services." *Hynes*, 451 So.2d. at 512. The policy of promoting the use of land was very important to the Court's decision because without such an easement the uses contemplated by the lease would be frustrated and

the land potentially rendered unusable. The Court concluded by encouraging the trial court, on remand, to consider "whether a refusal to recognize a 'way of necessity' renders the shut-in property (hangar # 3) incapable of being beneficially used and enjoyed as contemplated by the.... lease." *Hynes*, 451 So.2d at 512.

██ A further important distinction between *Hynes* and the issue presented here is that the Florida statute construed in *Hynes* looks to "beneficial use or enjoyment" of the landlocked parcel, while the controlling Georgia statute and case law does not impose such a qualification on the necessity for the easement sought. Georgia law governing easements by necessity is strictly construed, and looks solely to the necessity of accessing such a landlocked parcel, and to the order in which such parcels are sold. *See Moore v. Dooley*, 240 Ga. 472, 473, 241 S.E.2d 232 (1978) (citing *Wyatt v. Hendrix*, 146 Ga. 143, 144, 90 S.E. 957 (1916)); *Dovetail Props., Inc. v. Herron et al.*, 287 Ga.App. 808, 652 S.E.2d 856 (2007) (finding that "when an owner owns two adjacent parcels, sells one, and land locks the remaining parcel he or she owns, a private way of necessity cannot be obtained").

██ The facts presented at trial do not comport with the Georgia requirements for an easement by necessity because Franck has ingress and egress to his property by use of driveways and roads not owned by Flyboy. There was no evidence presented that Franck's property is incapable of being used and enjoyed without access to Flyboy's property. Indeed Franck subdivided his property and built a "subdivision" house [Ex. FB 15] on one of his remaining two parcels. Clearly the land is not idle or unusable. As such, Franck's argument of easement by necessity fails.

## C. Easement from Covenants, Conditions, and Restrictions

██ Franck argues next that the Declarations signed by numerous Subdivision residents grants an easement to Franck's predecessor in title, and then to Franck, to use the Airport and taxiways. [Ex. F 32]. The Declarations were not signed by all owners of lots in the Subdivision as evidenced by the lack of signatures from the McCrimmon's predecessor in title, and did not include exhibits A and B, referenced in the Declarations. Testimony at Trial was that the Declarations were the earlier of numerous drafts of an agreement that aimed to form a homeowners association that could take possession of and maintain the private Subdivision roads, in exchange for an easement that each lot owner could use to access the Airport. Musgrove, Franck's predecessor, signed the Declarations, but testified that he did not think the document became enforceable because it was not recorded. The Declarations fail to create an enforceable easement as discussed below.

### 1. The Declarations Do Not Comply with the Statute of Frauds

██ Georgia law states that contracts which pertain to "the sale of lands, or any interest in, or concerning lands" must be in writing and signed. O.C.G.A. § 13–5–30. Because the Declarations provided for conveyance of the private roads and an easement, interests in land, it is subject to the Statute of Frauds. "To satisfy the Statute of Frauds, a contract for the sale of property must state a clear and definite description of the property." *White v. Plumbing Distribs., Inc.*, 262 Ga. App. 228, 230, 585 S.E.2d 135 (2003). The description need not be perfect, but must give adequate notice and a definite description of the land being transferred. To comply with Georgia law, such a de-

scription must "disclose[ ] with sufficient certainty what the intention of the grantor was with respect to the quantity and location of the land.... so that the identification is practicable." *Id.* citing *Swan Kang, Inc. v. Kang,* 243 Ga.App. 684, 688, 534 S.E.2d 145 (2000), *see also Plantation Land Co. v. Bradshaw,* 232 Ga. 435, 440, 207 S.E.2d 49 (1974).

 Parol evidence is admissible to show "precise locations and boundaries" of such land or clarify a vague description. *White,* 262 Ga.App. at 230, 585 S.E.2d 135; *See also McClung v. Atlanta Real Estate Acquisitions, LLC,* 282 Ga.App. 759, 762, 639 S.E.2d 331 (2006) ("if a contract contains even a vague description of the property's location, that description will open the door to extrinsic evidence.... There must, however, be some indication within the contract itself of the location of the property"). In contrast, indefinite descriptions that make no mention of "size, shape, or location" are necessarily vague and fail to comply with the Statute of Frauds. *Plantation,* 232 Ga. at 440, 207 S.E.2d 49, *see also Gold Creek SL, LLC v. City of Dawsonville,* 290 Ga.App. 807, 660 S.E.2d 858 (2008). "The legal sufficiency of such a description is a question of law, to be decided by the court." *McClung,* 282 Ga. App. at 762, 639 S.E.2d 331 (citing *Field v. Mednikow,* 279 Ga.App. 380, 383, 631 S.E.2d 395 (2006)).

In *White v. Plumbing Distribs., Inc.,* the Plaintiff sought a declaration that a sales agreement to purchase an undeveloped tract of land was unenforceable because it lacked a sufficient description of the property, rendering the contract void under the Statute of Frauds. *White,* 262 Ga.App. at 228, 585 S.E.2d 135. The property in question was a nine acre parcel contained within a larger parcel subject to a "master plan" prepared by Defendant. *Id.* at 229, 585 S.E.2d 135. The master plan used physical features of the property that were depicted topographically as identifying information. Sketches overlaid on the master plan represented a parkway and commercial building locations. The sales contract identified the acreage and county in which the land was located and nearby highways, but referenced an attached "Exhibit A" for a further identification of the property, and an "Exhibit B" for more particular descriptions. While Exhibit A, a copy of the master plan, was attached to the sales agreement, Exhibit B, the legal description, was not a part of the agreement at the time it was executed.

The *White* court found that even if it was assumed that the property in question, the surrounding property, and the commercial properties identified in the master plan shared a common boundary, the master plan in Exhibit A was "devoid of any indicia upon which the parties might determine the metes and bounds of the [p]roperty insofar as these would be internal." *White,* 262 Ga.App. at 230, 585 S.E.2d 135. Furthermore, this meant parties "were left with unfettered discretion to make judgment calls" as to the exact location of the internal boundary of the property, which would necessarily be based on a survey obtained after the execution of the sales contract. *Id.* As such, the agreement was void and unenforceable and could not be rehabilitated by parol evidence, because no document existed at the time the agreement was executed that could establish the location and boundaries of the property. *Id.*

The Declarations identify the original parcel of Subdivision land based on land lot numbers in the specific district of Forsyth County, which is "more particularly described on that certain plat, copy of which is attached hereto marked 'Exhibit A.'" [Ex. F 32]. The Declarations also state those who signed the document had

purchased lots in the "Mathis Airport Subdivision," and are referred to as "Lot Owners" and that "the description of each Lot Owner's separate property being as set forth on 'Exhibit B.'" [Ex. F 32]. However, no exhibits were attached to the Declarations and it is undisputed that neither Exhibit A nor B were in existence at the time the Declarations were executed. *See* Deposition of Larry Bryant, pg. 19, lines 2–5. Thus, even if these documents were prepared later, they would not provide a basis for determining the location of the property that was intended to be governed by the Declarations. The descriptions contemplated by Exhibits "A" and "B" did not exist, and there are no other keys in the Declarations to identify the Lot Owner's properties [4]. The reference to the "Lot Owner's separate property" is so vague and indefinite that it fails to disclose which parcels of land were intended to be included under the agreement by the drafter and signers, and as such, parol evidence is inadmissible to clarify what was meant by "Lot Owner's separate property." Because neither the plat nor the description of the Lot Owner's property was included in the Declarations the Court cannot determine the location or size of the dominant or servient estates and thus, the Declarations are too vague to be enforced.

## 2. The Declarations do not Constitute a Valid Contract

██ Georgia law states that the essentials of a contract are as follows: (i) the parties must be able to contract; (ii) consideration; (iii) the parties must assent to the terms of the contract; and (iv) there must be a legal and operable subject matter. O.C.G.A. § 13–3–1. While there is no dispute as to the parties' ability to contract or the legality of the subject matter, the Court cannot find that there was assent to the Declarations.

Debtor argues that the contract failed because there was a lack of consideration. The Court does not agree. "All that is required by the law for a contract to have the element of consideration is that the contract furnish a key by which the consideration may be ascertained." 7 Ga. Jur. Contracts § 1:30 (citing *Newell Recycling of Atlanta, Inc. v. Jordan Jones & Goulding, Inc.*, 317 Ga.App. 464, 731 S.E.2d 361 (2012)). The Declarations state that the Lot Owners were to form a Home Owner's Association (the "HOA"), to which the Airport Owner's could deed the private subdivision roads. The Declarations also state that the HOA would maintain the roads, and that an easement to use the Subdivision roads and Airport taxiways and runways would be granted to the Lot Owners. The grant of ownership of the roads and easement in exchange for agreed-upon maintenance of the roads is clearly the consideration upon which the contract is based. Thus, the contract does not fail for lack of consideration.

██ Even though there was consideration, the contract is still unenforceable because there was no meeting of the minds. "It is well settled that an agreement between two parties will occur only when the minds of the parties meet at the same time, upon the same subject-matter, and in the same sense." *Cox Broad. Corp. v. Nat'l Collegiate Athletic Ass'n*, 250 Ga. 391, 395, 297 S.E.2d 733 (1982). Furthermore, "[w]hen parties to a contract.... know that they have different intents with respect to certain language before they

---

4. If the plat and/or the description of the lot owner's properties were in existence at the time the Declarations were executed, the reference in the Declarations could have allowed incorporation of the descriptions into the document. *See Chicago Title Ins. v. Investguard, Ltd.*, 215 Ga.App. 121, 449 S.E.2d 681 (1994).

enter into the contract, there can be no meeting of the minds upon the same subject matter and in the same sense and no agreement on that issue." *Id.* at 737–738.

The undisputed testimony at Trial was that the Declarations were not the final form of the document; not all Lot Owners executed the Declarations and the document was never finalized or recorded. The subsequent drafts were not amendments to the document admitted at trial, but simply later drafts, demonstrating that not all parties agreed upon the previous terms. The HOA was not formed subsequent to the signing of the Declaration, and the private roads were not deeded to the residents as was evidenced by the later litigation on the very roads that were supposed to be the subject of the Declarations. While there was testimony that residents did perform maintenance on Mathis Airpark Road, they did so under their own volition, not pursuant to the Declarations. Accordingly, there was no contract formed because there was no assent to the terms of the proposed agreement.

### D. Express Grant

Musgrove received the Addendum from L.G. Mathis in 1984 and Franck received the Addendum at the closing of his purchase of Musgrove's property in 2004. On that basis, Franck argues that he has the same rights as Musgrove under the Addendum.

The Addendum created an appurtenant easement because it was "created to benefit the possessor of the land in his use of the land," as opposed to an easement in gross, which is "a mere personal right in the land of another" *Church of the Nativity, Inc. v. Whitener,* 249 Ga.App. 45, 48, 547 S.E.2d 587 (2001) (citing *Yaali, Ltd. v. Barnes & Noble, Inc.,* 269 Ga. 695, 697, 506 S.E.2d 116 (1998); and *Stovall v. Coggins Granite Co.,* 116 Ga. 376, 378, 42 S.E. 723 (1902)). The easement is appurtenant and "runs with the land," because it was executed to benefit the owner of the Musgrove property.[5]

The rules of contract construction and interpretation apply to express easements. *National Hills Exchange, LLC v. Thompson,* 319 Ga.App. 777, 778, 736 S.E.2d 480 (2013). In interpreting an easement, courts are directed to look at, "the whole deed, the contract, the subject-matter, the object, the purpose, the nature of restrictions or limitations, the attendant facts and circumstances of the parties at the time of making the deed, and the consideration involved." *Khamis Enters., Inc. v. Boone,* 224 Ga.App. 348, 349, 480 S.E.2d 364 (1997). As is the case for contracts, parole evidence is not admissible unless an ambiguity exists on the face of the document. Once executed, an "[e]asement[ ] may only be terminated by operation of law or by the express terms of the deed granting the easement." 1 PINDAR'S GA. REAL ESTATE LAW & PROCEDURE § 8:28 (7th ed.), *Khamis Enters., Inc.,* 224 Ga. App. at 348, 480 S.E.2d 364, *see also Eagle Glen Unit Owners Ass'n, Inc. v. Lee,* 237 Ga.App. 240, 514 S.E.2d 40 (1999).

Debtor argues that the Addendum is not effective because it states "[t]his agreement shall survive the closing of this transaction," and that this language refers only to the Mathis/Musgrove closing. Because an appurtenant easement is transferred when the dominant estate is sold, even if the easement is not expressly mentioned in the conveyance, the Court does not agree with Debtor's argument. *See Church of*

**5.** *See Kiser v. Warner Robins Air Park Estates, Inc.,* 237 Ga. 385, 228 S.E.2d 795 (1976) (explaining that an easement can only be used in connection with the estate to which it is appurtenant).

*the Nativity, Inc.*, 249 Ga.App. at 47, 547 S.E.2d 587 (citing *O'Barr v. Duncan*, 187 Ga. 642(2), 2 S.E.2d 82 (1939)); *see also Eagle Glen Unit Owners Ass'n, Inc. v. Lee*, 237 Ga.App. 240, 514 S.E.2d 40 (1999). Thus, the Addendum easement is a binding instrument through which Franck received an easement to use the Airport Property.

██ The Addendum is not unlimited, rather it states that the owner of the Musgrove property has access to the Airport and use of the easement, "as long as Mathis Airport shall continue as an airport; however this shall not restrict Sellers' right to sell said airport property as an airport or for other use." [Ex. FB 2; F 17]. Although Georgia law does not favor the termination of easements, courts look to the intent of the parties and the plain language of the easement in determining its application. The language of the easement is clear that the grantor did not intend for the easement to continue in perpetuity, rather the grantor retained the ability to sell the Airport and to change the use of the Airport property. The language of the easement is clear that the easement will terminate if the Airport property is no longer used as an airport. Thus, once the Airport is sold for another use, Franck's easement is extinguished by its express terms. *See Weaver v. Henry*, 222 Ga.App. 103, 473 S.E.2d 495 (1996); *see also Kiser*, 237 Ga. at 386–387, 228 S.E.2d 795 (explaining that a later deed which granted an original easement without the limiting language "could not free the easement from any conditions attached to the grant to it").

Although Franck received the Addendum from Musgrove in 2004, it is undisputed that he did not record the Addendum until 2005, after Debtor purchased the Airport. [Ex. FB 2, Ex. F 17, Ex. F 23]. Franck argues that Flyboy had notice or

should have had notice of his easement, such that it is bound by the Addendum. Thus, the Court must next consider whether Flyboy is subject to or took free of the easement because the Addendum was not recorded prior to Debtor's purchase.

**E. Notice of Express Easement**

██ O.C.G.A. § 23–1–17 states that "[n]otice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it afterwards found that such inquiry might have led. Ignorance of a fact due to negligence shall be equivalent to knowledge in fixing the rights of the parties." *Deljoo v. SunTrust Mortg., Inc.*, 284 Ga. 438, 668 S.E.2d 245 (2008). With respect to notice of easements, "[l]and previously burdened with an easement is not freed by a subsequent conveyance of the land unless the purchaser takes without notice of the easement and is a purchaser for value. Where the existence of physical facts is such as to give notice of the existence of an easement, a subsequent purchaser for value will be subjected to the easement." *Webster v. Snapping Shoals Elec. Membership Corp.*, 176 Ga.App. 265, 266–67, 335 S.E.2d 637 (1985) (citing *Mathis v. Holcomb*, 215 Ga. 488, 489–490, 111 S.E.2d 50 (1959); *see also Hopkins v. Virginia Highland Assocs., L.P.*, 247 Ga.App. 243, 541 S.E.2d 386 (2000)). A question of fact arises when a court must decide, "[w]hether a purchaser of land.... had notice thereof at the time of purchase, or had notice of facts sufficient to put a reasonable man on inquiry" of an existing easement. *Webster*, 176 Ga.App. at 267, 335 S.E.2d 637, citing *Rome Gas–Light Co. v. Meyerhardt*, 61 Ga. 287(1) (1878). However, "when the easement being enjoyed is open and observable to any reasonably prudent person, the question of notice is not one of fact but one of law." *Webster*, 176 Ga.App.

at 267, 335 S.E.2d 637 (citing *Joel v. Publix–Lucas Theater*, 193 Ga. 531, 542, 19 S.E.2d 730 (1942)).

 Whether a bona fide purchaser has notice of an unrecorded easement will depend upon the degree of obviousness of the physical features of the property subject to the easement. Some features such as the existence of utility poles are so obviously a physical fact of the existence of an easement that a purchaser will be charged with notice as a matter of law. *Webster*, 176 Ga.App. at 267, 335 S.E.2d 637. Similarly, the existence of roads generally provides notice of an easement. *See, e.g.: Mize v. McGarity*, 293 Ga.App. 714, 718–19, 667 S.E.2d 695 (2008) (a clearly labeled mailbox at the end of the driveway for the owners of each of three lots, a locked gate and a road provided notice of an easement); *Reece v. Smith*, 265 Ga.App. 497, 499, 594 S.E.2d 654 (2004) (finding that the existence of a an old road stretching across a property, even though "eroded in places because of reduced use and maintenance" with "continued occasional use ... remained a visible physical features across the property at issue" was ample evidence of an easement). More obscure features may provide notice as well. *See Hopkins*, 247 Ga.App. at 246, 541 S.E.2d 386 (an unusual box on property labeled "Sanitary Sewer Clean Out" created a question of fact regarding notice).

 In contrast, a feature that at one time was obvious, but over time has become obscure does not constitute notice of an easement. *Parrott v. Fairmont Dev., Inc.*, 256 Ga.App. 253, 568 S.E.2d 148 (2002). In *Parrott*, Plaintiff purchased a shopping center serviced by a water line that ran across the property purchased by Defendant. The water line included a portion of a six inch PVC pipe, which protruded from the ground. By the time Defendant purchased the property, it was like a "jungle," such that neither the surveyor nor the engineer who inspected the property saw the pipe. In addition, upon inquiry by the engineer, city officials said there was no easement. Thus, inspection and due diligence did not reveal the pipe or the waterline easement. Because no "open and visible indications" of such an easement were present and due diligence did not uncover the waterline, Defendant took free of Plaintiff's asserted easement.

It is undisputed that Franck did not record the Addendum until after Debtor purchased the Airport Property. However, lack of recordation is not the sole test to determine if Flyboy bought the property subject to the easement. Flyboy will be subject to the easement if there was visible evidence on the land itself that provided notice.

At the time Flyboy purchased the Airport, there was a taxiway between Mathis Air Park Road and the Airport and hangars on three adjacent properties. [Ex. F 3, 4]. Specifically, there was a hangar-home on Franck's property, the McCrimmon's hangar and one large hangar and 3 T-hangars on what was referred to as the Durham property. [Ex. F 1]. In addition, Debtor's principal admitted that he had heard the Subdivision called Mathis Airpark Subdivision and had seen planes taxi on Mathis Airpark Road. While an inspection of the real estate records would not have revealed Franck's express easement, an inspection of the property revealed three lots that contained structures for housing planes and the taxiway between the Subdivision and the Airport. When these features are considered along with Debtor's knowledge that planes were taxied on Mathis Air Park Road and that the area was known as an Airpark there were sufficient visible indications to provide notice to Flyboy of the Addendum easement. These physical features and knowledge

were sufficient to require inquiry by Debtor. Debtor's principal testified that he did not ask C.J. Mathis about easements and Debtor's investigation was limited to a title search. Given the obvious features of the land and the Debtor's knowledge this inquiry was not sufficient and Debtor took the Airport Property subject to the Musgrove–Franck easement.

## IV. CONCLUSION

Franck seeks to expand the easement granted in the Addendum though various theories all of which fail. Franck received an express easement from Musgrove that allows use of the Airport Property until such time as the Airport is no longer used as an airport. The grantor's intent in the Addendum is clear, to reserve for himself the ability to sell the property and/or change the use of the Airport and terminate the Addendum easement. Because of the obvious physical characteristics of the taxiway and adjacent properties, Debtor was on notice and is bound by the Addendum, notwithstanding the lack of recordation of the Addendum prior to Debtor's purchase of the Airport.